Leon DAVIS, Plaintiff,

v.

L.D. MOSS, et al., Defendants.

C.A. 90–278–4–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Jan. 4, 1994.

Leland K. Hawks, Jr., Monroe, GA, John W. Timmons, Jr., Athens, GA, for Leon Davis.

Carlton Latain Kell, Atlanta, GA, Jerry A. Lumley, Timothy Harden, III, Macon, GA, for L.D. Moss.

Carlton Latain Kell, Neal B. Childers, Atlanta, GA, for Gerald Jordan.

OWENS, Chief Judge:

The court held a bench trial in this prisoner civil rights action brought under 42 U.S.C. § 1983. Plaintiff Davis charged that his Eighth Amendment right to be free from cruel and unusual punishment was abridged by defendant Moss when he shoved plaintiff down the stairs of a fire escape and by defendant Jordan when he punched Davis in the face and struck Davis' legs with a night stick. Davis prays for compensatory and punitive damages. The court will consider the claims separately as plaintiff does not allege that the defendants acted in concert. After thorough consideration of the evidence presented at trial and the relevant law, the court makes the following findings of fact and conclusions of law.

### FACTS

At all times relevant to plaintiff's claim, he was an inmate of the Rivers Correctional Institution ("Rivers C.I."), Hardwick, Georgia. Defendants Moss and Jordan were employed as correctional officers at Rivers C.I. In the late night and early morning hours of January 3 and 4, 1989, a riot broke out in several buildings at Rivers C.I. The plaintiff was housed in dormitory one on the first floor of the North building ("Rivers North"). The North building houses inmates on floors one, two, and three. Dormitories one and two are on the first floor, dormitories three and four are on the second floor, and dormitories five and six are on the third level.

On the night of January 3, 1989, some of the Rivers North inmates participated in the riot by building fires on pool tables, breaking televisions, lights, and windows, and otherwise creating a disturbance. In sum, thirteen fires blazed in three prison buildings. Witnesses reported that fire and smoke spilled out of the broken windows. Correctional officials from Rivers and surrounding institutions were called in to assist in quelling the riot. They in turn were backed up by local law enforcement.

Tactical squads, or riot teams, were charged with entering the dormitories, sub-

duing the rioting inmates, and evacuating the others. Defendant Jordan was a member of a tactical squad assigned to evacuate the North building. Each tactical squad member wore a black jacket and pants and was equipped with a gas mask and helmet. Under the direction of Captain Stanley, Jordan's tactical squad first entered dormitory five after using tear gas to mollify the rioters. Tear gas was not used in any other dormitory in the North building. Dormitory one was the last one in Rivers North to be evacuated. When the tactical squad arrived at dormitory one, the warden had already removed the rioters, who were relatively few in number. Tactical squad members entered dormitory one, led the remaining inmates to the sallie port door where they handcuffed the inmates with "plasti-cuffs", and turned them over to correctional officers who directed them up the stairwell and into the cafeteria.[1]

Plaintiff Davis testified that Correctional Officer Jordan, dressed in a light blue jumpsuit or uniform, was standing on the first landing and that as Davis walked up the stairs from his dormitory, Jordan punched him in the face. Davis walked back down the stairs and was told by an unidentified officer to continue back up the stairs. As Davis complied with this directive, Jordan struck his legs with his night stick. Davis does not claim any permanent injuries as a result of this beating.

The court disbelieves Davis' testimony and allegations against Jordan. Witnesses, including Jordan himself, testified that Jordan and all tactical squad members wore the black uniform of the squad as opposed to a light blue uniform. Additionally, the gas masks and helmet, which Jordan wore throughout the four-hour riot, made the tactical squad members unrecognizable. Moreover, the tactical squad worked solely in the dormitories and did not use the stairwells while inmates were being evacuated. In sum, plaintiff has not proven that Jordan used excessive force upon him by a prepon-

---

1. During the riot, the tactical squad members, while themselves correctional officers, were distinct from correctional officers who were not tactical squad members because the tactical squad was specially outfitted and assigned.

derance of the evidence. Accordingly, judgment must be granted in favor of Jordan.

■ Davis further testified that as he was escorted out of dormitory one he looked through a window and saw inmates being thrown down the fire escape stairs. Davis then climbed the stairs to the second floor and walked through the cafeteria.[2] As he walked toward the door to the fire escape, Davis saw Moss throwing people down the metal fire escape and tried to attract the attention of Jack Joris, a senior counselor at Rivers, who was present in the cafeteria.[3] Before Davis could speak with Joris, Moss grabbed him from behind at the shoulders and by his handcuffed hands and shoved him outside and down the fire escape stairs. Davis fell head over heels down the metal stairs.[4]

Counselor Joris testified that he was an eyewitness to the assault and that Moss intentionally and angrily shoved Davis down the stairs. Moreover, Moss had no need to discipline Davis, according to Joris, because he was not "acting up". Immediately after the incident, Joris ran to the fire escape doorway, thinking that Moss had thrown the inmate over the railing of the fire escape. At that point, he saw Davis pick himself up after having fallen to the first floor landing. Joris immediately confronted Moss about the shoving, and the pair exchanged words. Joris promptly reported the incident first to the deputy warden and then to others. Upon learning that Moss had been involved in a disturbance, the warden reassigned Moss to the East building for the remainder of the evacuation.

Another witness, Sam Flurry,[5] testified to seeing Moss and Davis at the top of the fire escape at Rivers North, when Moss "turned

the inmate loose" and Davis tumbled down a flight of stairs, tried to right himself and fell down the rest of the stairs. Flurry was "troubled" by the incident.

Moss denied shoving any inmate and denied seeing any inmate tumble down the stairs. Moss testified that he escorted the inmates to the top of the fire escape where he then handed the prisoners over to another correctional officer; however, he could not identify the officer who assisted him on the stairs. Moss claims only to have evacuated dormitories four, five, and six, which were the first three dormitories to be evacuated. Several witnesses testified to Moss' good reputation as a correctional officer and to his calm demeanor on the night of the riot.

After considering all the evidence and noting inconsistencies of certain testimony, the court finds that plaintiff Davis has proven by a preponderance of the evidence that Correctional Officer Moss used excessive force in violation of Davis' Eighth Amendment rights when he shoved Davis down the fire escape stairs of Rivers North on January 4, 1989. The eyewitness corroboration of Davis' claim was compelling. In addition, the testimony of defendant Moss did not appear credible, as it seems incredible that Moss failed to see plaintiff fall down the stairs.

### ANALYSIS

■ The Eighth Amendment protects prisoners from "cruel and unusual punishment." *See Wilson v. Seiter,* 501 U.S. 294, ——, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102–05, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976). Such cruel and unusual punishment occurs where prison officials inflict pain on

---

**2.** Inmates on all floors had to be evacuated through the second floor because the other floors lacked fire escapes.

**3.** Joris had been called around 1:30 am on January 4, 1989, and was asked to assist in the evacuation. He stationed himself in the second floor cafeteria to control the flow of inmates going through the cafeteria to the fire escape door.

**4.** Witnesses dispute whether plaintiff fell the entire way down the stairs to the ground or whether he was able to right himself at the first floor landing. Determining the exact length of the fall is unnecessary, as Davis could have suffered injury from the fall regardless of its length.

**5.** Sam Flurry worked as a correctional officer at Rivers and also part-time as a sheriff's deputy for Baldwin County. In his role as a sheriff's deputy, he was called to Rivers C.I. during the riot and stood outside Rivers North about 40 feet from the fire escape.

prisoners unnecessarily and wantonly. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251, 260 (1986). Eighth Amendment claims consist of both an objective and subjective component. *See Hudson v. McMillian*, 503 U.S. ——, —————, 112 S.Ct. 995, 999–1000, 117 L.Ed.2d 156, 166 (1992); *Wilson*, 501 U.S. at ——, 111 S.Ct. at 2324. Courts "must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at ——, 112 S.Ct. at 1000, *citing, Wilson*, 501 U.S. at ——, 111 S.Ct. at 2321.

The objective analysis of an Eighth Amendment claim focuses on whether the deprivation is of a serious nature. The Supreme Court has rejected the árgument that a plaintiff's injury must be significant for him to state a claim of excessive force under the Eighth Amendment. *Hudson*, 503 U.S. at ——, 112 S.Ct. at 999. Davis suffered substantial injury as a result of his fall down the fire escape stairs. The fall itself produced significant pain; moreover, the fall permanently damaged two discs in plaintiff's lower back causing him to undergo back surgery. Therefore, Davis' claim satisfies the objective prong of the Eighth Amendment analysis.

 In addition, the plaintiff must satisfy the subjective component of an Eighth Amendment violation. The plaintiff must prove that the defendant acted with a certain state of mind, i.e. wantonly. The particular state of mind, intentional or malicious, depends on the basis of the claim. *Compare Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (wantonness in challenge to inadequate medical treatment is "deliberate indifference" by prison officials); *with Hudson*, 503 U.S. at ——, 112 S.Ct. at 999 (wantonness in excessive force claim is "malicious and sadistic" behavior). In an excessive force claim, the court must find that the official acted "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at ——, 112 S.Ct. at 999. The *Hudson* Court extended the above standard, first announced in *Whitley*, to all excessive force claims. The Court reasoned that

the prison officials, whether they are presented with a riot situation as in *Whitley* or simply are attempting to maintain order and discipline, must balance the need to restore discipline with the risk of injury to inmates. *Hudson*, 503 U.S. at ——, 112 S.Ct. at 999. When assessing the defendant's behavior, a finder of fact should consider the following factors: 1) the extent of the plaintiff's injuries; 2) the need for the application of force; 3) the correlation between that need and the amount of force used; 4) the threat reasonably perceived by the defendant; and 5) any efforts made by the defendant to temper the severity of a forceful response. *Hudson*, 503 U.S. at ——, 112 S.Ct. at 999 (*citing Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085).

Analyzing the action of Moss under the maliciousness standard of *Hudson*, the court finds that Moss did not act with a good faith motive to restore discipline. Plaintiff was handcuffed and was neither resisting nor threatening Correctional Officer Moss. Defendant presented no evidence of the need to use force whatsoever, much less the amount of force needed to shove a man down a flight of metal stairs. The court finds that Moss' actions were motivated by malice and ill will toward inmate Davis. Plaintiff Davis must prevail on his Eighth Amendment claim against defendant Moss.

### DAMAGES

In light of the above findings of fact and conclusions of law, an award of damages to plaintiff is appropriate to compensate for the pain he suffered at the time of the incident and for any lasting effects he suffers. However, special damages are not warranted because all of plaintiff's medical expenses have been paid by the Department of Corrections, and the plaintiff's own expert physician concludes that further surgery is unnecessary.

 The parties have contested the appropriateness of an award for lost earning capacity. Generally, the amount of damages must be proved with a reasonable degree of certainty so that the award is not the product of speculation. While this rule does not prevent a plaintiff who works intermittently to be awarded an amount for diminished earning capacity, evidence must be presented

from which a finder of fact can estimate, or infer the loss or decrease in earning capacity with reasonable certainty. *Michaels v. Kroger Co.,* 172 Ga.App. 280, 286, 322 S.E.2d 903 (1984); *Hunt v. Williams,* 104 Ga.App. 442, 443, 122 S.E.2d 149 (1961). *See also Draper Canning Co. v. Dempsey,* 91 Ga.App. 593, 597, 86 S.E.2d 678 (1955).

■ After considering this issue, the court has determined as a factual matter that plaintiff is not entitled to recover for lost earnings capacity. The evidence does not justify such an award because plaintiff has presented no evidence of past gainful employment or other productive activity. While plaintiff's back problems may limit his ability to accomplish certain job tasks, the court finds no evidence that plaintiff would have applied himself to income-generating employment but for the injury. Plaintiff's past work history is minimal. Though apparently supporting himself, he worked only sporadically at farm jobs.[6] He left high school while in eighth grade. Since that time, he has been in and out of the Georgia penal system.[7] After being paroled on May 21, 1993, plaintiff has failed to go to either the unemployment office or the department of vocational rehabilitation. Moreover, he admits to not having applied for jobs, but has simply "asked around". In light of plaintiff's meager past work history, the court finds that any award for impairment of his earning capacity would be speculative.

■ In conclusion, compensatory damages are warranted to compensate plaintiff for his pain and suffering. Against Correctional Officer Moss, the court awards the plaintiff $10,000 in compensatory damages.

■ The court further concludes that punitive damages should be awarded in this case. *Smith v. Wade,* 461 U.S. 30, 51–56, 103 S.Ct. 1625, 1637–40, 75 L.Ed.2d 632 (1983). The imposition of punitive damages are necessary to deter Moss and other correctional officials from using unnecessary and malicious force against inmates. The Court in *Smith v. Wade* authorized punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." The court recognizes that "callous indifference" may be insufficient to support an award of punitive damages in light of *Hudson v. McMillian;* however, the court has found specifically that Moss acted with a malicious intent to harm Davis. Hence, an award of punitive damages is appropriate. In his claim against Correctional Officer Moss, the court awards plaintiff $25,000 in punitive damages.

The plaintiff is directed to file and serve his fee petition on or before fourteen days after the entry of judgment in this case. Defendants are directed to file and serve their objections, if any, on or before twenty days after the filing of the fee petition. The court encourages the parties to settle the attorney fees issue. If after a good faith effort they cannot settle the issue, plaintiff's counsel should so notify the court.

## CONCLUSION

The court directs the Clerk of the Court to enter judgment in favor of the plaintiff Davis with regard to the his Eighth Amendment claim against defendant Moss. The damage amounts should be entered as set in the preceding section of this Order, for an award in compensatory damages of $10,000, and an award in punitive damages of $25,000. The Clerk of the Court is further directed to enter judgment on plaintiff's Eighth Amend-

---

6. Defendant's exhibit one, a pre-sentence investigation report completed in 1980, discloses that Davis worked sporadically as a chicken catcher, being paid by the number of chickens caught. His employer stated that Davis did not work full-time, but "may work one day a week if he wants to." Defendant's Exhibit 1.

7. Davis' criminal offenses began in 1976, when he was thirteen years of age. He was committed to the Youth Detention Center ("YDC") twice,

before being convicted as an adult for burglary. He was conditionally released under the youthful offender program in March 1982. However, the parole board revoked his conditional release in August 1983 for failing to maintain full-time employment, possessing a firearm, and committing the offense of terroristic threats and acts. In November 1984, Davis was convicted of armed robbery. He was serving this sentence at the time of his injury.

ment claim against defendant Jordan in favor of Jordan.

**SO ORDERED.**